425 F.2d 1022
 Bernice WILKINS, Individually, and on Behalf of Paula Sue
Hoover and Stanley Neil Wilkins, a Minor, Sole
Heirs at Law of Paul H. Wilkins,
Deceased, Appellees,
v.
Ernest P. HOGAN, Jr., and Tri-State Insurance Company, Appellants.
 No. 231-69.
 United States Court of Appeals, Tenth Circuit.
 May 18, 1970.
 
 1
 William Hergenreter, Topeka, Kan. (Shaw, Hergenreter & Quarnstrom, Topeka, Kan., on the brief), for appellees.
 
 
 2
 Arthur E. Palmer, Topeka, Kan. (Goodell, Casey, Briman, Rice & Cogswell, Topeka, Kan., on the brief), for appellants.
 
 
 3
 Before LEWIS and SETH, Circuit Judges, and BRATTON, District Judge.
 
 
 4
 BRATTON, District Judge.
 
 
 5
 This wrongful death action was originally filed in the Kansas state court by Bernice Wilkins for herself and her children as the heirs of Paul H. Wilkins. It was thereafter removed to the federal court by the defendants-appellants Ernest P. Hogan, Jr., and Tri-State Insurance Company. The case was subsequently tried to a jury, and a verdict of $26,674.92 was returned in favor of the plaintiffs.
 
 
 6
 The action arose out of an automobile collision that occurred on January 27, 1967 between a Chevrolet automobile driven by the decedent Wilkins and a Plymouth automobile driven by Hogan within the scope of his employment by Tri-State Insurance.
 
 
 7
 It had snowed the night before the accident so that on January 27 the highway was snow-packed and icy. Even though the road had been graded, ice and snow remained in sufficient quantities to obliterate the median line between the northbound and southbound lanes of traffic. The east and west shoulders of the road were similarly indistinguishable.
 
 
 8
 Prior to the accident the Wilkins' vehicle was proceeding north in the east lane of the highway, and the Hogan car was proceeding south in the west lane of traffic.
 
 
 9
 There were no eye witnesses to the actual collision between the vehicles other than Hogan.
 
 
 10
 A state trooper who arrived at the scene shortly after the accident did not at that time conduct a full investigation, although he did take photographs of the scene and the two automobiles. He continued his investigation on the following day when, with the help of the sheriff, he took measurements.
 
 
 11
 The following morning he again visited the accident scene, where he observed three gouge marks on the east side of the pavement, together with debris from the accident.
 
 
 12
 He prepared a sketch of the scene which reflected that Hogan's car had traveled on for approximately 60 feet from the area where was found the debris, while the Wilkins' vehicle had proceeded in a northeasterly direction for only a very short distance.
 
 
 13
 He also visited Hogan in the hospital shortly after the accident. In response to the trooper's questions to him about whether the Wilkins' vehicle had been skidding or out of control as it approached his car before the collision, he answered in the negative. Further questioning about whether his own car was in any way out of control also elicited a negative response.
 
 
 14
 An auto damage appraiser who happened upon the scene shortly after the accident and who saw both cars at the scene subsequently examined the underside of the Wilkins' car, took measurements of the heavy scar marks found there, and then visited the accident scene, where he took measurements of the gouge marks. His comparison of the two sets of measurements reflected that the distances between the scar marks on the underside of the Chevrolet corresponded to the distances between the gouge marks in the northbound lane of traffic.
 
 
 15
 A physicist from the University of Kansas also examined the cars, the gouge marks and photographs of the scene, as well as the state trooper's report of the accident.
 
 
 16
 All three of these men testified for the plaintiff at trial as to the facts described above. In addition, the scientist testified as to his opinion of the angle of collision, stating that he thought the left front corner of the Chevrolet and the center of the front of the Plymouth had come together at the point of impact.
 
 
 17
 He further testified that, based upon his knowledge, experience and the physical evidence, he believed that the Plymouth was traveling faster than was the Chevrolet.
 
 
 18
 It was also his opinion that gouge marks were very apt to be found at the point of impact and that debris was indicative of the point of impact.
 
 
 19
 Finally he stated that based upon the physical evidence he believed there were only two ways in which the accident could have happened. If the Chevrolet had been proceeding north in its own lane, at least one-half of the left front of the Plymouth would have had to cross over into the lane to come together at the angle of collision he believed had occurred. If, on the other hand, the Plymouth had been proceeding south in its own lane of traffic right against the center line, nearly all of the Chevrolet would have had to have been in the southbound lane, with the rear of the Chevrolet very close to the west edge of the pavement. His sketch delineating the above testimony was admitted into evidence.
 
 
 20
 The defense called a Wichita, Kansas, policeman as its expert witness. Based upon the photographs and his examination of the cars, he stated that he thought the accident had occurred in Hogan's lane of traffic and that the Wilkins' car had been traveling faster.
 
 
 21
 Also called by the defense was a truck driver who, while he did not see the actual impact, did come upon the scene immediately thereafter and observed the cars spinning. Although he could not see the center line, he believed that the accident had taken place near the center of the highway on the west side of the road.
 
 
 22
 Mr. Hogan testified that he was in a state of shock when he talked to the trooper, so that what he may have said at that time regarding the Wilkins' car would have been incorrect. He further testified that the Wilkins' car either skidded or fishtailed into his automobile as he was proceeding south in his own lane.
 
 
 23
 After judgment, the appellants moved the court for entry of a judgment n.o.v. or for a new trial. Their motion was denied by the trial court.
 
 
 24
 On appeal they contend that the denial of the motion for judgment n.o.v. was erroneous, asserting that the appellee's evidence failed to prove a prima facie case against them. Their claim is that jury's verdict was based on no more than a speculative guess, inasmuch as the evidence in the case only tended to prove that there were two possibilities as to how the accident occurred.
 
 
 25
 On such a motion, the evidence and all reasonable inferences to be drawn therefrom must be considered in the light most favorable to the party against whom the motion is directed. 2B Barron and Holtzoff, 1079, pp. 412-13; Chicago, Rock Island & Pacific R. Co. v. Consumers Coop. Ass'n., 180 F.2d 900 (10th Cir. 1950), cert. denied, 340 U.S. 813, 71 S.Ct. 42, 95 L.Ed. 598 (1950). It must be said that the facts and reasonable inferences present in this case furnish sufficient evidence favorable to appellee to present a jury question and to support the jury's verdict thereon. Indeed, a fair appraisal of all the evidence reveals substantial support for the verdict returned against the defendants as to liability.
 
 
 26
 The trial court correctly denied the motion for a judgment n.o.v., and that denial presents no meritorious issue on this appeal.
 
 
 27
 The appellants' alternative claim on appeal is that their motion for a new trial should have been granted, either because of the improper admission into evidence of the physicist's testimony and the evidence relating to the gouges or because erroneous instructions relating to negligence, circumstantial evidence and damages were given by the trial court to the jury. None of the grounds advanced in support of this claim has merit.
 
 
 28
 The contention relating to the improper admission of evidence can succeed only if such evidence is considered in isolation, as is here attempted by appellants. When all the evidence in the case relating to the gouge marks is considered, they are sufficiently tied to the location and time of the impact.
 
 
 29
 The same thing is true of the physicist's testimony about how the accident could have occurred. His testimony was based upon physical evidence, and, when considered together with other evidence relating to the position of the two cars before and after impact, it becomes substantially more than the abstract speculation that appellants would have us believe that it is.
 
 
 30
 The negligence instruction complained of related to failure to control, to keep a proper lookout and to speed. Suffice it to say that the facts set forth above support the giving of such an instruction.
 
 
 31
 Appellants' contention that the circumstantial evidence instruction given[1] does not accord with the law of Kansas is based upon Bottjer v. Hammond, 200 Kan. 327, 436 P.2d 882 (1968). The Bottjer case states that a fact cannot be proved by circumstances which are merely consistent with its existence but, rather, the circumstances relied upon must be of such a nature and so interrelated that the only reasonable conclusion that can be drawn is the theory sought to be established.
 
 
 32
 However, the instruction given accords with the rule stated in the later case of American Family Mutual Ins. Co. v. Grim, 201 Kan. 340, 440 P.2d 621 (1968). In Grim it is said that in a civil case the circumstantial evidence sufficient to sustain a finding need not rise to that degree of certainty which excludes any and every other reasonable conclusion, and the court holds that such evidence is sufficient if it affords a 'basis for a reasonable inference by the * * * jury of the occurrence of the fact in issue, although some other inference equally reasonable might be drawn therefrom.'
 
 
 33
 Not only does the instruction in the present case accord with the rule in Grim, but there are also other similarities between the kind of evidence presented in the present case and that presented in Grim. There are none between this case and the Bottjer case, supra.
 
 
 34
 Finally, appellants complain of the court's damage instruction relating to financial support given by a decedent to his wife and children. While conceding that this is a proper abstract statement of the law, K.S.A. 60-1904 (1949), the appellants claim that there is no evidence in the record either that the decedent wholly or partially supported his wife or children or of the family relationship they had with him.
 
 
 35
 Contrary to appellants' assertion, the evidence at trial established more than the bare fact of bereavement. Among other facts, it established that appellee and her children were decedent's sole heirs; that appellee and decedent were living together at the time of his death; his age; his life expectancy; his income and the filing of joint returns with regard thereto; and that the male child was a minor and a student at the time of his father's death.
 
 
 36
 Kansas law allows the elements of damage here challenged to be inferred or implied from facts and circumstances introduced into evidence. See Roda v. Williams, 195 Kan. 507, 407 P.2d 471 (1965); Corman v. WEG Dial Tel., Inc., 194 Kan. 783, 402 P.2d 112 (1965). There is a sufficient basis to support such an inference in the record of this case.
 
 
 37
 Affirmed.
 
 
 
 [1]
 The Court's instruction was as follows:
 With respect to the question of inferences that may be drawn from the circumstances of the case, I instruct you that there are two classes of evidence recognized and admitted in courts of justice. One is direct evidence, and the other is circumstantial evidence. In 'direct' evidence, witnesses testify directly of their own knowledge of the main fact or facts to be proved, while 'circumstantial' evidence is the proof of certain facts and circumstances in a given case from which a jury may, under certain conditions, infer other connecting facts which usually and reasonably follow according to the common experiences of mankind.